IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| KELLY RICE,<br>    Plaintiff,<br><br>v.<br><br>FARMERS NEW WORLD LIFE<br>INSURANCE COMPANY,<br>    Defendant. | Case No. 1:16-cv-01446-JES-JEH |

### ORDER

Before the Court are the Defendant, Farmers New World Life Insurance Company's ("Farmers"), Motion for Summary Judgment (D. 46),[1] the Plaintiff, Kelly Rice's, Response (D. 47), and the Plaintiff's Reply (D. 49). For the reasons stated, *infra*, the Defendant's Motion for Summary Judgment is DENIED.

### BACKGROUND

The Plaintiff originally brought this breach of contract and insurance code relief action against the Defendant in Illinois' Circuit Court of Knox County. (D. 9-1). The Court granted the Defendant removal of the case to the Central District of Illinois. (D. 1); (D. 9). The Plaintiff alleges the Defendant breached the parties' contract, a life insurance policy issued by the Defendant to her husband, Terry Rice. (D. 9-1 at pp. 1-3). Specifically, she claims the Defendant failed to pay her—the designated beneficiary—$100,000 upon Terry's death. *Id*. The Plaintiff further alleges she is entitled to interest on that amount (*Id*.), statutory damages, attorney's fees, and other costs (*Id*. at pp. 4-6). The Defendant insists it rescinded the life insurance policy at issue because Terry provided false answers to medical history questions on the application which were

---

[1] Citations to the Docket in this case are abbreviated as "D. __."

1

material to its decision to issue the policy. (D. 46 at pg. 1). The Plaintiff maintains that she and her husband were never asked the relevant questions. (D. 47 at pg. 1). The undisputed facts demonstrate the following:

Michael Rogers, a Farmers insurance agent, contacted Kelly about Terry and Kelly buying life insurance policies from Farmers in May or June 2014. (D. 47 at pg. 10, 14); (D. 49 at pg. 1, 7). The Rices decided to purchase life insurance through Rogers, beginning the process sometime in early July. (D. 47 at pg. 14); (D. 49 at pg. 7). Rogers never spoke directly with Terry and obtained all of his information through Kelly over the phone. (D. 47 at pp. 11, 14); (D. 49 at pp. 2, 7). On July 23, 2014, in response to Rogers' inquiry as to when the Rices were going to visit his office to sign their life insurance applications, Kelly informed Rogers that Terry was in the hospital. *Id*.

Terry arrived at the emergency room of St. Mary Medical Center in Galesburg at 4:21 PM on July, 22 2014. (D. 46-1). He complained of abdominal pain and diarrhea. The medical staff conducted several tests, including a computed tomography ("CT") scan of Terry's abdomen and pelvis. The CT scan revealed that he had "multiple low-density liver lesions consistent with metastatic disease." (D. 46-3). A biopsy was recommended. *Id*. At 9:36 PM, he was transferred from the emergency department to oncology. (D. 46-2 at pg. 2).

In oncology, doctor Thomas Whittle was 95% certain Terry had colorectal cancer with additional metastases on his liver and possibly his lungs. (D. 46-4 at pg. 4). He performed a colonoscopy and biopsy on Terry on July 23, 2014. *Id*.; (D. 46-7 at pg. 4). Whittle's office also scheduled an appoint for Terry with an oncologist, doctor Julius Bonello, on that day. (D. 46-10

2

at pg. 3). Terry was discharged from St. Mary on July 23, 2014 at 6:42 PM. (D. 46-9). His treatment notes indicate that he was also treated for nicotine dependence while he was there.[2] *Id.*

A representative with Bonello's office confirmed with Kelly on July 24, that Terry's appointment on July 28, 2014 was a consultation for colon cancer treatment. *Id.* at pg. 12. On July 25, 2014 at 11:11 AM, a surgical pathology report confirmed that Terry had colon cancer. (D. 46-12).

Additionally, on July 25, 2014, Rogers electronically submitted Terry's application for life insurance to Farmers. (D. 46-13 at pg. 1). The timestamp on the application indicates that Terry and Kelly signed the application at the equivalent of 4:39 PM Central Daylight Time. (D. 46-13 at pg. 10). The following language was displayed above the signature line of the electronic signature pad when Terry signed the application:

> I (We) acknowledge that I (we) have read and understand all of the forms displayed and agree that the electronic signature I (we) provide below shall be applied to all of these forms and will not be used on any other forms or future transactions.

(D. 46-14 at pg. 16).

Relevant to the dispute before the Court, Terry's life insurance application contained the following questions:

> 5. Have you, in the past seven years, had, consulted a physician or other healthcare provider(s) for, or been treated or hospitalized for or taken medication for any of the following: any diseases or disorders of the heart (including rheumatic fever), circulatory system, diabetes/ endocrine/ thyroid, blood, kidneys, liver, digestive system, lungs (including allergies or sleep apnea); any mental or nervous disorders (including depression, anxiety, or suicide); muscular, spinal, joint, or bone disorders or injuries (including concussions); high blood pressure; elevated cholesterol; cancer/skin cancer; stroke; epilepsy/ seizures (including dizziness or fainting); arthritis; congenital defects or physical impairments?
> 7. Have you, in the past 12 months, been hospitalized for 24 or more consecutive hours?

---

[2] After his death, Kelly admitted that Terry smoked cigarettes during the 12 month period prior to signing his life insurance application. (D. 46-13 at pg. 39).

> 8. Have you scheduled or been advised to have, a surgical operation, diagnostic test, or evaluation that has not been completed?
> 9. Have you, in the past 12 months, used Tobacco or Nicotine products in any form?

(D. 46-13 at pp. 8-9). The answer on the application was "No" to each of the above questions. *Id*.

The Defendant's records indicate that Rogers started, completed, and submitted Terry's life insurance application in 2 hours and 38 minutes. (D. 46-14 at pg. 8). Kelly admits that some of the questions on the life insurance application were answered before the day she and Terry signed the application, but insists that none of the health related questions were asked. (D. 47 at pg. 7). Rogers did not show the Rices any documents on the day they signed Terry's life insurance application. (D. 47 at pp. 12, 14); (D. 49 at pp. 4, 8).

Farmers issued the policy to Terry, effective July 28, 2014. (D. 46-11 at pg. 54). Terry designated Kelly as the primary beneficiary. (D. 46-13 at pg. 7). Under the terms of the policy, the Defendant was allowed to contest the policy if Terry died within two years of the date of issue. *Id*. at pg. 17.

Terry died of cancer on March 21, 2016, within the two-year contestability period. *Id*. at pg. 28. The claims process on Terry's policy was initiated on March 28, 2016. (D. 46-16). The Defendant began a claim evaluation on the same date, closing it on July 7, 2016. *Id*.; (D. 46-13 at pp. 55-57). During the evaluation, the Defendant gathered Terry's medical records from his healthcare providers. (D. 46-17). The Defendant also questioned Rogers to determine whether the information recorded on Terry's application accurately reflected what was conveyed to him. (D. 46-13 at pg. 4); (D. 46-13 at pp. 47-48; 51-52). During the claim investigation, the Defendant communicated with Kelly at regular intervals, updating her on the status of the process. (D. 46-13 at pg. 30); (D. 46-18); (D. 46-19); (D. 46-20); (D. 46-21); (D. 46-22).

When asked in April of 2016 whether Terry was asked every question on his life insurance application, Rogers responded: "[a]s far as I recall, honestly went over it quickly it was a simple form and these are usually accept or decline sorry it was two years ago[.]" (D. 46-13 at pg. 47). After completing that questionnaire, Rogers emailed Farmers' claims examiner Ray Woo, stating: "[a]t the time the policy was written neither Terry nor I was aware of the problem." (D. 46-23 at pg. 1). He acknowledges, however, that he did not know Terry very well and hardly spoke to him. (D. 46-11 at pg. 35); (D. 46-24).

The Defendant ultimately concluded that the life insurance policy was null and void due to Terry's failure to truthfully answer questions 5, 7, and 9 on the application, and refunded the premiums paid. (D. 46-13 at pp. 55-57). In medical records, the Defendant discovered that Terry had a history of colon cancer with metastases to the liver, and that within the 12 month period before his application he had used tobacco and been hospitalized for 24 or more consecutive hours. *Id*. The Defendant informed Kelly that this information was significant and material to their evaluation of his insurability, and said that if it had been disclosed at the time of application, it would not have issued the policy. *Id*. The Defendant further advised Kelly that she was entitled to have the Illinois Department of Insurance review the matter if she believed their decision was incorrect and concluded by stating "[i]f there are any additional facts available that could have an effect on the consideration that has been given to this claim, we request that it be forwarded to the address listed on our letterhead." *Id*. at pp. 56-57.

Kelly submitted a letter to the Defendant from Bonello in which he stated that on July 28, 2014, he was the first to share with Terry the results of the biopsy and confirm his cancer diagnosis. (D. 46-8). He also stated in his letter that Terry "was told that [his colonic mass, on which a biopsy had been performed] might represent a colon cancer." *Id*. Although the letter implies that Terry's

colonoscopy and biopsy were performed on July 26, 2014, the parties agree that these procedures were actually done on July 23, 2014. (D. 46 at pg. 4); (D. 47 at pg. 9). The Defendant responded to Kelly's submission of the Bonello letter by explaining that their decision remained unchanged because Terry failed to disclose his hospitalization, testing, and treatment which all occurred prior to applying for life insurance. (D. 46-25).

In response, Kelly claimed that Rogers never asked any of the medical questions on the application. (D. 46 at pg. 11); (D. 47 at pg. 3). In fact, she later stated that she only recalled Rogers asking for their Social Security numbers and dates of birth during the application process. (D. 47 at pg. 14); (D. 49 at pg. 8). With her response, Kelly submitted to the Defendant a series of text messages between herself and Rogers. (D. 46-28). This included text messages with Kelly and Rogers stating that neither of them remember Rogers asking the nicotine use question, Kelly stating that she does not recall all of the questions being asked, and Rogers acknowledging in response "[y]eah we did the app over the phone ahead of time…didn't really need to ask the scuba diving or rock climbing questions lol." *Id*. at pp. 25-27. The Defendant determined that the text messages presented no new facts regarding the application process for Terry's life insurance policy and informed Kelly that their decision was unchanged. (D. 46-27).

When asked during a deposition in July of 2017 if he recalled asking question number five on the life insurance application, Rogers initially responded that it would have been done "[v]ery quickly." (D. 46-11 at pg. 12). He went on to explain that he did not specifically recall whether he asked in this instance and did not want to confirm either way. *Id*. Rogers further admitted that it is possible that he did not ask all of the questions on the application. *Id*. at pg. 13. He said this is largely because he relies on the fact that the Defendant runs a medical information bureau report on all life insurance applicants to authenticate the accuracy of the medical information they submit.

6

*Id*. at pg. 18. He state that in his estimation, this process typically reveals when an applicant's information is inaccurate. *Id*. Rogers also stated, however, that he typically asks the questions of all applicants. *Id*.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court reviews the facts in a light most favorable to the non-movants, in this instance, the Plaintiff. *Vodak v. City of Chicago*, 639 F.3d 738, 740 (7th Cir. 2011). The moving party—here, the Defendant—has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997).

The non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; they "must do more than simply show that there is some metaphysical doubt as to the material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). Undeveloped and unsupported arguments are waived. *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001). Finally, a scintilla of evidence in support of the non-movant's position is not sufficient to successfully oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 250.

Generally speaking, in life insurance cases federal courts pick the law of the state where the insured was domiciled when the policy was applied for—in this case, Illinois. *Prudential Ins. Co. of America v. Athmer*, 178 F. 3d 473, 477 (7th Cir. 1999).

**ANALYSIS**

First, the Defendant argues that it is entitled to rescind the policy at issue because Terry made material misrepresentations when he completed his application. (D. 46 at pp. 12-12). The Plaintiff asserts that the Defendant cannot deny her benefits under the life insurance policy based upon answers to questions it never asked. (D. 47 at pp. 23-32).

"Rescission is an equitable remedy that cancels a contract and returns the parties to the *status quo ante*, with each returning any benefits received under the contract. *Penn Mut. Life Ins. Co. v. Greatbanc Trust Co.*, 887 F. Supp. 2d 822, 828 (N.D. Ill. 2012) (citations to Illinois case law omitted). "Rescission presumes the existence of an otherwise valid and enforceable contract." *Id.* (citing *Jensen v. Quik Intern.*, 820 N.E. 2d 462, 466-67 (Ill. 2004). Under Illinois law, in order to be entitled to rescission the Defendant must demonstrate that the only reasonable inferences from the record are that (1) a misrepresentation was made and (2) the misrepresentation either was made with an intent to deceive or materially affected the risk accepted or hazard assumed. 215 ILCS 5/154; *New England Mut. Life Ins. Co. v. Bank of Illinois in DuPage*, 994 F. Supp. 970, 976 (N.D. Ill. 1998).

Given the record before the Court, the Defendant cannot establish the first prong—that the only reasonable inference to be drawn from the undisputed facts is that Terry misrepresented the facts when applying for life insurance. While the Defendant argues Terry engaged in misrepresentation, its argument is premised on the acceptance of a disputed fact: that Rogers asked Terry (through Kelly) the medical questions and was provided with false answers. It is a disputed issue of material fact whether Terry was asked the relevant questions, let alone answered them

8

falsely. Rogers himself admits that it is possible he did not ask all questions listed on the application. The disputed nature of these facts precludes summary judgment in favor of the Defendant. Viewing the facts in a light most favorable to the Plaintiff, the Defendant's Motion for Summary Judgment on this issue is DENIED.

The Defendant further asserts that Terry is bound by the terms of his life insurance application, regardless of whether or not he reviewed it prior to signing. (D. 46 at pp. 16-17). In support of its argument, the Defendant cites *Ward-Kelley v. Fortis Ins. Co.*, 227 F. Supp. 2d 972, 974 (N.D. Ill. 2002) and *Small v. Prudential Life Ins. Co.*, 617 N.E. 2d 80, 83 (Ill. App. Ct. 1st Dist. 1993). *Id*. The Plaintiff claims the Defendant's argument on this point is "hard[] to understand" in light of the fact that Terry "never saw or directly signed the application." (D. 47 at pg. 29). In making her argument, the Plaintiff relies heavily on *Beck v. Capitol Life Ins. Co.*, 363 N.E. 2d 170 (Ill. App. Ct. 3rd Dist. 1977) and *Pekin Ins. Co. v. Adams*, 796 N.E. 2d 175 (4th Dist. 2003). *Id*. at pp. 27-29.

The Northern District Court correctly noted that *Small* stands for the proposition that "an insured is bound by the representations on a form he signs." *Ward-Kelley*, 227 F. Supp. 2d at 974 (citing *Small*, 617 N.E. 2d at 83). In *Small*, the trial court did not find the insured's claim that he did not make a misrepresentation on his life insurance application credible. *Small*, 617 N.E. 2d at 82. The Illinois appellate court affirmed the trial court's finding, and further noted "[e]ven if the decedent did not read the application before he signed it, as the plaintiff argues, he nevertheless is bound by the document." *Id*. at 83 (citations omitted). Notably, the plaintiff in *Small* completed the application himself. *Id*. at 82.

In *Pekin*, the Illinois appellate court noted that an insurer is estopped from asserting misrepresentation as a defense, absent collusion, when an agent of the insurer completes the

9

application without asking the applicant the questions therein. *Pekin*, 796 N.E. 2d at 180 (citing *Beck*, 363 N.E. 2d at 172). The appellate court disagreed with the plaintiff's argument that *Beck* was distinguishable from the facts in *Pekin* because, *inter alia*, the applicant in *Beck* never signed their name certifying that they read the application and verified the truth of its contents. *Id*. The applicant in *Pekin* did sign the application authenticating their information. *Id*. The appellate court went on to note, however, that the Illinois supreme court in *Johnson v. Royal Neighbors of America*, 97 N.E. 1084, 1085 (Ill. 1912), found that "requests to verify the accuracy of the answers does not 'affect' the 'rule' of waiver, such a request, standing alone, cannot prove bad faith or fraud by the insured." *Id*. at 182.

Thus, under Illinois law while parties are generally bound by the documents they sign, whether they read them or not (*Small*, 617 N.E. 2d at 83), insurers are estopped from asserting misrepresentation as a defense when an agent of the insurer completes the application without asking the applicant the questions therein, absent an independent basis to find that the agent and the insured colluded (*Pekin*, 796 N.E. 2d at 180). And the Illinois supreme court has explicitly ruled that an insured's signature attesting to the veracity of the contents of their application does not negate the type of waiver espoused in *Pekin*. *Johnson*, 97 N.E. at 1086.

In the instant case, it is undisputed that Rogers completed the life insurance application for Terry by asking Kelly questions over the phone. The Plaintiff provides extensive details in arguing that there was no collusion between Rogers and the Rices (D. 47 at pp. 30-32), but the Defendant does not allege there was any collusion (D. 46 at pp. 16-17). As previously discussed, however, whether Rogers asked Kelly the pertinent medical questions is a disputed issue of material fact. Whether the Defendant is subject to the waiver is contingent upon a factual finding that Rogers did not ask the Rices the relevant questions from the life insurance application. The same holds

true for the Court's determination as to whether or not the Plaintiff is bound by Terry's signing of the application. Therefore, the Defendant is not entitled to summary judgment on the issue at this time and their corresponding Motion for Summary Judgment is DENIED without prejudice.

Lastly, the Defendant claims that even if it is not entitled to summary judgment on the issue of rescission, it is entitled to summary judgment on Count II, the Plaintiff's "bad faith" claim for insurance code relief, pursuant to 215 ILCS 5/155. (D. 46 at pp. 17-19). The Plaintiff asserts that the Defendant's claim for summary judgment on Count II should be denied. (D. 47 at pp. 32-35).

Under Section 155 of the Illinois Insurance Code, the Plaintiff is entitled to an award of attorneys fees and other costs if the Defendant's actions were "vexatious and unreasonable." 215 ILCS 5/155. In order to meet this showing, the Plaintiff must demonstrate that the Defendant's behavior was "willful and without reasonable cause." *Citizens First National Bank of Princeton v. Cincinnati Ins. Co.*, 200 F. 3d 1102, 1110 (7th Cir. 2000). The insurer's conduct will not be deemed vexatious if:

> (1) there is a bona fide dispute concerning the scope and application of insurance coverage; (2) the insurer asserts a legitimate policy defense; (3) the claim presents a genuine legal or factual issue regarding coverage; or (4) the insurer takes a reasonable legal position on an unsettled issue of law.

*Id*. (internal citations omitted).

"Although the question of what constitutes vexatious and unreasonable conduct is a fact-specific inquiry, the final evaluation of the insurer's conduct is made by the court." *Bernstein v. Genesis Ins. Co.*, 90 F. Supp. 2d 932, 940 (N.D. Ill. 2000). In determining whether an insurer's conduct is vexatious and unreasonable, the Court must look at the totality of the circumstances. *Smith v. Equitable Life Assur. Soc. of U.S.*, 67 F. 3d 611, 618 (7th Cir. 1995).

Here, the Court has identified a genuine factual dispute concerning the Plaintiff's coverage—whether Rogers asked the Rices the medical questions at issue. The Court's

determination of the vexatiousness or unreasonableness of the Defendant's conduct hinges, at least in part, however, on the answer to that question. The Court does not know the totality of the circumstances at this time. Thus, summary judgment is not appropriate on this issue at this stage of the litigation. The Defendant's Motion for Summary Judgment on Count II is therefore, DENIED without prejudice.

## Conclusion

Viewing the evidence of record in a light most favorable to the Plaintiff, the Defendant's Motion for Summary Judgment (D. 46) is DENIED.

*It is so ordered.*

Entered on May 9, 2018

s/ James E. Shadid\_\_\_

James E. Shadid
Chief U.S. District Judge